**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| WALLEYE TRADING LLC, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>ABBVIE INC. and WILLIAM J. CHASE,<br><br>        Defendants. | **No. 1:18-cv-05114**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Walleye Trading LLC, individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the defendants' public documents, and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding defendant AbbVie Inc. ("ABBV" or the "Company"), news articles about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION AND RELEVANT BACKGROUND**

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined herein) who purchased ABBV securities on May 30, 2018 (the "Class

Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      According to its public filings, ABBV is a global, research-based biopharmaceutical company. On or about April 26, 2018, ABBV announced that it would conduct a modified "Dutch auction" to repurchase up to $7.5 billion of the Company's common stock (the "Dutch Tender Offer").

3.      Pursuant to a Dutch auction, a company sets a range of prices at which it is willing to buy back a fixed dollar amount of stock from the company's stockholders, and the stockholders choose the price within the range they would like to sell at, if at all.  The company then buys back shares at whatever price level allows it to expend the total, fixed-dollar amount of money that the company was willing to spend.  Accordingly, if shareholders are only willing to tender their shares at the higher end of the range, the company will repurchase fewer shares, whereas if enough shareholders tender shares at the bottom of the range, the company will repurchase a greater number of shares.

4.      ABBV announced that it would repurchase $7.5 billion of stock through the Dutch Tender Offer, making it one of the largest Dutch tender offers in history.  The maximum number of shares that would be repurchased would be a function of the "Purchase Price."  The Purchase Price is the lowest price at which ABBV could buy back an aggregate $7.5 billion worth of stock.  All shareholders who tendered at or below the Purchase Price would receive the Purchase Price, subject to potential proration.  With regard to the Dutch Tender Offer, ABBV set its tender range at $99 - $114 per share (in $1.00 increments).  For example, at $99, ABBV could buy back up to 75.8m of the Company's shares (4.8% of shares outstanding). At $114, ABBV could buy back up to 65.8m shares (4.1% of shares outstanding).  There was no minimum tender condition.

5.    Notably, the closing price for the Company's shares on April 25, 2018 (the pre-Dutch Tender Offer announcement price) was $91.87, so the range of Purchase Prices ran from an approximate 8% premium to a 24% premium to the Company's then unaffected share price (though ABBV closed at $96.55 the day prior to setting the range and launching the offer).

6.    ABBV shareholders were also entitled to participate in the Dutch Tender Offer at whatever price it cleared, rather than picking a specific price at which to tender.  That had the same effect as tendering at $99.

7.    In addition, ABBV had the right to purchase up to an additional 2% of its shares outstanding (approximately 32 million shares) if more than $7.5 billion worth of shares were tendered at or below the Purchase Price.

8.    The Dutch Tender Offer commenced on May 1, 2018, and expired at midnight at the end of the day on May 29, 2018.  Shareholders had between those periods to elect to tender their shares.

9.    The Dutch Tender Offer was facilitated through Section 13(e)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), as an issuer tender offer subject to Rule 13e-4. Accordingly, the investors participating in the Dutch Tender Offer were protected by Section 14(e) of the Exchange Act and Regulation 14E.  *See* www.sec.gov/rules/interp/34-43069.htm.  Section 14(e) of the Exchange Act is the antifraud provision for all tender offers, including tender offers under Rule 13e-4.  Section 14(e) prohibits fraudulent, deceptive, and manipulative acts in connection with a tender offer.  The antifraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5 also apply to all tender offers.  15 U.S.C. 78j; 17 CFR 240.10b-5.

10.   The Class Period begins on Wednesday morning, May 30, 2018.  At approximately 8:00 a.m. Eastern Standard Time, before the stock market opened for regular trading, through a

3

SCHEDULE TO (Amendment No. 7) Tender Offer Statement Under Section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934 (the "Initial Tender Offer Statement"), ABBV announced preliminary results of the Dutch Tender Offer (through an attached press release). The Company stated that a total of 75.7 million shares were tendered at or below the purchase price of $105 per share. Thus, ABBV would acquire 71.4 million shares of ABBV stock at $105 per share, for an aggregate cost of $7.5 billion gross of fees and expenses, or approximately 4.5% of the Company's shares outstanding.

11. The market reacted positively to this news because it revealed that shareholders in ABBV were unwilling to part with $7.5 billion of ABBV shares unless the price was $105 per share. During the trading day of May 30, 2018, based on the representation that the Dutch Tender Offer Price was $105 per share, ABBV stock traded between $100.83 and $103.16, and closed at $103.01. That closing price represented over a 3.5% gain from the previous day's close of $99.47. Over 31 million ABBV shares were traded that day, representing over $3.1 billion in dollar volume. In dollar terms, this was the greatest volume traded in ABBV on a single day since 2014.

12. At approximately 4:46pm on May 30, 2018, after the market had closed for regular trading, ABBV issued a press release and filed a SCHEDULE TO (Amendment No. 8) Tender Offer Statement Under Section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934 (the "Corrected Tender Offer Statement") announcing "updated preliminary results" of the Dutch Tender Offer. The Corrected Tender Offer Statement materially changed the results of the Dutch Tender Offer announced earlier that day in the Initial Tender Offer Statement. According to ABBV, a total of 74.0M shares of ABBV's common stock had been tendered and not properly withdrawn at or below the purchase price of **$103 per share,** including 52.9 million shares that were tendered by notice of guaranteed delivery. Thus, ABBV was now stating that it would acquire approximately 72.8M shares

4

of its common stock at a reduced price of **$103 per share**, or approximately 4.6% of the shares outstanding.

13.     The change from $105 per share to $103 per share was material, as it showed that many more ABBV shareholders were willing to tender at that price.  Learning that shareholders would instead be sellers at $103, by comparison, dampened that optimistic market assessment.  When the market found out that the Dutch Tender Offer was actually priced at $103 per share, the consequences were swift and brutal.  During the next trading day, May 31, 2018, ABBV stock traded sharply downward between $98.50 and $101 per share.  By the end of the trading day on May 31, 2018, it closed down almost 4% at $98.94. Almost 19 million ABBV shares were traded that day.  Thus, purchasers of ABBV stock on May 30, 2018, who purchased at artificially inflated prices, collectively lost well over $100 million in under 24 hours as a result of the Company's corrective disclosure.

14.     Despite the price in the Initial Tender Offer Statement being "preliminary" and "subject to change," it is quite *atypical to revise the tender clearing price in a Dutch tender offer – especially of the magnitude experienced with the ABBV Dutch Tender Offer*.  In an attempt to mollify furious ABBV investors who were deceived by the Initial Tender Offer Statement about the material discrepancy in the pricing, the Company stated in the Corrected Tender Offer Statement that "this update reflects additional shares that were validly tendered by notice of guaranteed delivery, *but that were erroneously omitted from the initial preliminary results provided to AbbVie by Computershare Trust Company*, N.A., the depositary for the tender offer."  In other words, the Company's excuse is that it either could not perform a simple arithmetic check and/or failed to check the accuracy of the work of its depositary before inducing investors to buy some $3 billion of the Company's stock.

15.     For at least three reasons, this explanation does not excuse ABBV from liability.  First, it is highly unlikely that ABBV discovered this substantial "error" after the close of trading on May

30, 2018 (*e.g.*, 4:01pm), and, was able to issue the press release and file the Corrected Tender Offer Statement by 4:46pm. A company is duty bound to make corrective disclosures immediately upon learning of false or misleading information in the marketplace. The most plausible inference here is that ABBV learned of the error far earlier, but chose to let the market close before revealing that it could not conduct a simple arithmetic calculation and/or failed to check the work of its depositary. The Company's delay of the corrective disclosure until after trading closed caused tens of millions of shares to be traded and purchased at artificially inflated prices because of the materially false and misleading information that had been disseminated by ABBV into the market. Second, as a recent case just held with respect to tender offers under 14(e) of the Exchange Act, negligence can suffice when stating such a claim (*Varjabedian v. Emulex*, -- F.3d ----, 2018 WL 1882905 (9th Cir., April 20, 2018)). Even if ABBV did not act with intent, it is beyond plausible that the Company's (i) failure to perform grammar-school arithmetic and/or check the work of its depositary and (ii) decision to disclose this materially false calculation to the marketplace constitutes conduct that falls well below the reasonably-prudent-person standard of care. The Company should be held liable under 14(e) for its negligence. Third, there is a strong inference that ABBV did in fact act with the requisite intent. The Company knew that one of the largest tender offers in history was being closely watched by market participants and, of particular interest, would be the number of ABBV shares tendered and at what price they were being tendered. It was nothing short of severe recklessness to announce results that, with no plausible excuse, simply failed to count *millions* of shares that were tendered at an amount well below the $105 price specified in the press release. Indeed, defendant William J. Chase ("Chase"), who signed the Initial Tender Offer Statement, is ABBV's Chief Financial Officer. A grammar-school student could easily perform the mathematical calculations necessary to derive the Purchase Price. Other than reckless misconduct, there is no plausible explanation for how a Fortune

100's CFO failed to correctly tabulate the tendered shares and then publicly reported materially false, market-moving information to shareholders.

16.     In addition, at all relevant times, Computershare Trust Company, N.A. ("Computershare"), acted within the scope of its agency as the depositary for the Company in the Dutch Tender Offer. Computershare knew that its Dutch Tender Offer tabulations and analyses would be incorporated into the Company's press releases and filings, and would be relied upon by shareholders and influence the market. As described herein, Computershare acted with reckless indifference by failing to check its work and/or incorporating all available data into its analyses that were sent to ABBV for publication. *See Tellabs v. Makor Issues & Rights, Ltd.*, 513 F.3d 702, 710 (7th Cir. 2008) (scienter may be imputed to the corporation based on intent and/or reckless disregard, even if that individual/entity is not a named defendant).

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b), 14(e) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5, and 15 U.S.C. §78n(e).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). ABBV is located in this District and its shares are traded in this District and many of the acts and practices complained of occurred in substantial part herein.

20.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21.     As reflected in the accompanying PSLRA certification, Plaintiff purchased ABBV securities on May 30, 2018 and was damaged thereby.

22.     Defendant ABBV is a Delaware corporation maintaining its principal place of business at 1 North Waukegan Road, North Chicago, Illinois. 60064.  ABBV shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ABBV."

23.     Defendant Chase serves as the Executive Vice President and Chief Financial Officer of ABBV.  Defendant Chase signed the materially false and misleading Initial Tender Offer Statement.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

24.     The Class Period begins on Wednesday morning, May 30, 2018.  At approximately 8:00 a.m. Eastern Standard Time, before the stock market opened for regular trading, ABBV filed the Initial Tender Offer Statement with the SEC.  Defendant Chase signed the Initial Tender Offer Statement.  That press release attached to the Initial Tender Offer Statement stated in relevant part:

> NORTH CHICAGO, Ill., May 30, 2018 /PRNewswire/ -- AbbVie (NYSE: ABBV) today announced the preliminary results of its modified Dutch auction tender offer, which expired at 12:00 midnight, New York City time, at the end of May 29, 2018.  Based on the preliminary count by Computershare Trust Company, N.A., the depositary for the tender offer, a total of 75,743,313 shares of AbbVie's common stock, $0.01 par value per share, were properly tendered and not properly withdrawn at or below the purchase price of $105 per share, including 49,129,844 shares that were tendered by notice of guaranteed delivery. AbbVie has been informed by the depositary that the preliminary proration factor for the tender offer is approximately 94.3 percent.  In accordance with the terms and conditions of the tender offer, and based on the preliminary count by the depositary, AbbVie expects to acquire approximately 71.4 million shares of its common stock at a price of $105per share, for an aggregate cost of approximately $7.5 billion, excluding fees and expenses relating to the tender offer. These shares represent approximately 4.5 percent of the shares outstanding. . . . .

25.     The foregoing statements were materially false and misleading and/or omitted to state other facts necessary to make the statements made not misleading because, *inter alia,* the price to be paid in the Dutch Tender Offer was not $105 per ABBV common share, it was actually $103 per share.  Based on this materially false statement, ABBV shares traded-up sharply on May 30, 2018, closing at $103.01 per share, on volume of over 30 million shares.

## THE TRUTH IS REVEALED

26.     After the close of trading on May 30, 2018, at approximately 4:46pm, the Company stunned investors by issuing the following press release (and also filing the Corrected Tender Offer Statement with the SEC).  The corrected Tender Offer Statement was signed by defendant Chase. The press release stated in pertinent part:

> NORTH CHICAGO, Ill., May 30, 2018 /PRNewswire/ -- AbbVie (NYSE: ABBV) today announced the preliminary results of its modified Dutch auction tender offer, which expired at 12:00 midnight, New York City time, at the end of May 29, 2018.This update replaces the preliminary results announced at 8:00 am, New York City time, on May 30, 2018.  This update reflects additional shares that were validly tendered by notice of guaranteed delivery, but that were erroneously omitted from the initial preliminary results provided to AbbVie by Computershare Trust Company, N.A., the depositary for the tender offer. **Final results of the tender offer will be issued no later than June 4, 2018 following the expiration of the notice of guaranteed delivery period.** Based on the updated preliminary count by Computershare Trust Company, N.A., the depositary for the tender offer, a total of 74,033,457 shares of AbbVie's common stock, $0.01 par value per share, were properly tendered and not properly withdrawn at or below the purchase price of $103 per share, including 52,915,569 shares that were tendered by notice of guaranteed delivery. AbbVie has been informed by the depositary that the preliminary proration factor for the tender offer is approximately 98.4 percent. In accordance with the terms and conditions of the tender offer, and based on the preliminary count by the depositary, AbbVie expects to acquire approximately 72.8 million shares of its common stock at a price of $103 per share, for an aggregate cost of approximately $7.5 billion, excluding fees and expenses relating to the tender offer. These shares represent approximately 4.6 percent of the shares outstanding. . . . .

9

27.     By comparing the two releases, it appears that ABBV utterly failed to account for almost four million shares tendered by guaranteed delivery.  There is no plausible excuse for this arithmetic oversight.  The Company cannot and has never claimed that the shares were submitted late, irregularly, or in any other fashion that would allow a person exercising even a scintilla of prudence and basic oversight to overlook them.

28.     Once the Company corrected its materially false initial statement, the price of ABBV shares declined precipitously.  On information and belief, plaintiff realleges that ABBV did not discover its failure to account for millions of validly tendered shares at 4:46 p.m. on May 30 -- 45 minutes after the market closed.  The most plausible inference is that Computershare and ABBV knew or, if not for their severe recklessness, would have known far earlier in the trading day that they failed to perform simple addition.  Waiting until after the close of trading to issue a corrective statement was unreasonable given the massive volume of activity in ABBV's stock during regular trading hours.  Investors should not have been misled in the first place as a result of defendants' severe recklessness; they certainly had a right to learn the truth during regular market hours, not after ABBV allowed over $3 billion of inflated purchases in the open market.

29.     On May 31, 2018, *Bloomberg* published an article entitled: *Traders Are Furious After Computer Botches Stock Sale*.  Importantly, while the Company had stated that the numbers were "preliminary" and "subject to change," a hedge fund manager quoted in the article stated that *"he has never seen a company change the pricing of a tender hours after releasing initial terms."* The article stated, in relevant part:

> Equity traders were fuming after <u>AbbVie Inc.</u>, maker of the world's
> biggest-selling medicine, Humira, announced the wrong price in a
> Dutch auction tender for about $7.5 billion of its own stock.
> The North Chicago, Illinois-based pharmaceutical giant last
> night <u>corrected</u> the price it will pay for shares tendered in the buyback

offer to $103 apiece, from $105 announced earlier in the day. AbbVie said some stock was "erroneously omitted from the initial preliminary results" in calculations by a third-party depositary.
What's infuriating traders is that AbbVie rose the most in a month during Wednesday's session -- before the mistake was announced….

Only a handful of Dutch auctions have ever exceeded AbbVie's. Amgen Inc.'s $10 billion offer in March was one. Home Depot Inc. did another for $10.5 billion in shares in 2007. *Michael Samuels, an event-driven portfolio manager for Broome Street Capital, said he has never seen a company change the pricing of a tender hours after releasing initial terms. Seven other U.S. traders who asked not to be named voiced similar dismay.* . . . A spokesperson for Computershare acknowledged the mistake and said the company apologized for the "one-off issue." Adelle Infante, a spokeswoman for AbbVie, pointed to Wednesday's press release in response to a request for comment. [Emphasis added].

### ADDITIONAL SCIENTER ALLEGATIONS

30.     While plaintiff believes that negligence suffices for the 14(e) claim, for purposes of the 10(b) claim, defendants acted with the requisite scienter as well. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding ABBV and the results of the Dutch Tender Offer, were active and culpable participants in the fraud alleged herein.

31.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraud described herein could not have been perpetrated during the Class Period without the knowledge and

11

complicity or, at least, the reckless disregard of personnel at the highest levels of the Company, including defendant Chase, the Company's CFO.

32.     Defendant Chase, because of his position with ABBV, controlled the financial contents of the Company's public statements during the Class Period.  Defendant Chase was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  No person—let alone the CFO of a massive public company—could review the data and simply fail to count almost four million validly tendered shares.  The only plausible explanations are that ABBV did not review the data at all before making a material misrepresentation to the marketplace or that the Company's review was so irresponsibly cursory that the officer of the Company responsible for keeping its books failed to perform third-grade arithmetic.  Either way, there is a strong inference that defendants engaged in such an extreme departure from the standard of care that their misconduct constituted actionable recklessness.

33.     Defendants surely knew that the marketplace was following the Dutch tender process closely and that billions of dollars of Company shares would trade following the announcement of the tender clearing price.  Armed with that knowledge, any reasonable CFO would check and recheck the data to assure accuracy.  Failing to do so, or failing to perform basic addition, is not some minor deviation, but a meaningful departure from the standard of care.

34.     Because of his position and access to material non-public information, defendant Chase knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, defendant Chase is responsible for the accuracy of

12

ABBV's corporate statements (including the Initial Tender Offer Statement) and is therefore responsible and liable for the misrepresentations contained therein.

35.     Finally, Defendants knew or were severely reckless in disregarding that the statements were materially false and misleading and/or omitted to state other facts necessary to make the statements made not misleading because: (1) Defendants rushed-out the Dutch Tender Offer results that were riddled with serious mistakes that had the ability to and did move the market without proper verification; and (2) given the timing of the corrective disclosure (i.e., almost immediately after the close of the market) Defendants were aware there was a problem with the announced results of the Dutch Tender Offer earlier in the trading day but did not issue a timely corrective disclosure and/or halt the trading of the stock, allowing countless additional shares to be purchased by misled investors at inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ABBV securities during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, or any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ABBV shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records

maintained by ABBV or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented the results of the Dutch Tender Offer;

- whether Defendant Chase caused ABBV to issue false and misleading statements during the Class Period;

- whether defendants acted negligently, knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ABBV securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

43. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 1288 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

44. In the alternative, Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud on the market doctrine for the following reasons set forth below.

45. The market for ABBV's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, the securities traded at artificially inflated prices during the Class Period, Plaintiff and other members of the Class purchased or otherwise acquired the securities relying upon the integrity of the market price of the securities and market information relating to the Dutch Tender Offer and have been damaged hereby.

46. During the Class Period, the artificial inflation of the securities was caused by the material misrepresentations and omissions particularized in this Complaint and caused the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Dutch Tender Offer. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus

causing the price of the securities to be artificially inflated at all relevant times, and when disclosed negatively affected their value. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the securities at such artificially inflated prices, and each of them has been damaged as a result.

47. At all relevant times, the market for ABBV's common stock (and other securities) was an efficient market for the following reasons, among others:

(a) The Company's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, ABBV filed periodic public reports with the SEC and/or the NYSE;

(c) Defendants regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

(d) ABBV was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

48. As a result of the foregoing, the market for the securities promptly digested current information regarding ABBV from all publicly available sources and reflected such information in the price of the securities. Under these circumstances, all purchasers of ABBV securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices and are entitled to a presumption of reliance.

**LOSS CAUSATION**

49.     Defendants' wrongful conduct as alleged herein directly and proximately caused the economic loss suffered by Plaintiff and the Class.  During the Class Period, Plaintiff and the Class purchased or acquired ABBV securities at artificially inflated prices and were damaged thereby.  The price of ABBV securities significantly declined when the true information was revealed, causing investors' losses.  Following disclosure that the Dutch Tender Offer price was only $103 per share, the price of ABBV's common stock (as well as its other securities) declined sharply on heavy trading volume of almost 19 million shares.

**NO SAFE HARBOR**

50.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of ABBV who knew that the statement was false when made.

## COUNT I

### (Against All Defendants For Violations of
### Section 14(e) of the Exchange Act)

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of material fact or omit to state any material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading . . ." 15 U.S.C. § 78n(e).

53.     As discussed above, defendants filed and delivered the false and misleading Initial Tender Offer Statement.  Defendants knew or recklessly disregarded and/or were negligent in that the Initial Tender Offer Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     Additionally, defendants failed to timely correct the Initial Tender Offer Statement filing.

55.     The Initial Tender Offer Statement was prepared, reviewed and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Dutch Tender Offer.

56.     In so doing, Defendants made untrue statements of material facts and omitted facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Initial Tender Offer Statement, defendants were aware of this information and their obligation to disclose this information in the Initial Tender Offer Statement.

57.     The omissions and incomplete and misleading statements are material.  A reasonable investor would view the information identified above as altering the total mix of information available to stockholders.

58.     Defendants knowingly, or with deliberate recklessness and/or negligently, misrepresented the material information identified above from the Dutch Tender Offer and the Initial Tender Offer Statement, causing certain statements therein to be materially incorrect and/or incomplete and therefore misleading.  As a senior officer of ABBV, Defendant Chase had knowledge of the details of the Dutch Tender Offer.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, Defendants: (1) engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; (2) made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was

19

intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ABBV's securities; and (iii) cause Plaintiff and other members of the Class to purchase ABBV securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

63. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases and other statements and documents described above. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the ABBV Dutch Tender Offer.

64. By virtue of his position at ABBV, Defendant Chase had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants (including checking the work of the depositary). Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the Chief Financial Officer of ABBV, Defendant Chase had knowledge of the details of ABBV's internal financial affairs and the results of the Dutch Tender Offer.

66.     Defendant Chase is liable both directly and indirectly for the wrongs complained of herein.  Because of his position of control and authority, Defendant Chase was able to and did, directly or indirectly, control the content of the statements of ABBV (including the Initial Tender Offer Statement).  As an officer of a publicly-held company, Defendant Chase had a duty to disseminate timely, accurate, and truthful information with respect to ABBV's businesses, operations, future financial condition, future prospects and the Dutch Tender Offer results.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ABBV securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Dutch Tender Offer result, Plaintiff and the other members of the Class purchased ABBV securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

67.     During the Class Period, ABBV common stock (and other securities) was traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased ABBV securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of ABBV securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of ABBV securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false financial statements to the investing public related to the Dutch Tender Offer.

## COUNT III

### (Violations of Section 20(a) of the
### Exchange Act Against Defendant Chase)

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, Defendant Chase participated in the operation and management of ABBV, and conducted and participated, directly and indirectly, in the conduct of ABBV's business affairs, including the Dutch Tender Offer.  Because of his senior position, defendant Chase knew the adverse non-public information regarding ABBV and the results of the Dutch Tender Offer.

72.     As an officer of a publicly owned company, Defendant Chase had a duty to disseminate accurate and truthful information with respect to ABBV's financial condition and results of the Dutch Tender Offer, and to correct promptly any public statements issued by ABBV which had become materially false or misleading.

73.     Because of his position of control and authority as a senior officer, Defendant Chase was able to, and did, control the contents of the various reports, press releases and public filings

which ABBV disseminated in the marketplace during the Class Period concerning ABBV's financial prospects (including the Initial Tender Offer Statement). Throughout the Class Period, Defendant Chase exercised his power and authority to cause ABBV to engage in the wrongful acts complained of herein. Defendant Chase therefore, was a "controlling person" of ABBV within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of ABBV securities.

74.     Defendant Chase, therefore, acted as a controlling person of ABBV. By reason of his senior management position at ABBV, Defendant Chase had the power to direct the actions of, and exercised the same to cause, ABBV to engage in the unlawful acts and conduct complained of herein. Defendant Chase exercised control over the financial operations of ABBV and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.     By reason of the above conduct, Defendant Chase is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ABBV.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.  Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 26, 2018                    **KELLER LENKNER LLC**


By: /s/ Tom Kayes
Ashley C. Keller
Seth A. Meyer
Tom Kayes
150 N. Riverside Plaza, Suite 2570
Chicago, IL 60606
Telephone: (312) 741-5222

**KELLER LENKNER LLC**
U. Seth Ottensoser
  (PHV application forthcoming)
1330 Avenue of the Americas
New York, NY 10019
Telephone: (212) 653-9715

*Counsel for Plaintiff*