**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WALLEYE TRADING LLC, individually and on behalf of all others similarly situated,<br>Plaintiff,<br><br>v.<br><br>ABBVIE INC. and WILLIAM J. CHASE,<br>Defendants. | ) | **Civil Action No. 1:18-cv-05114**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Walleye Trading LLC, individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its amended complaint against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Defendant AbbVie Inc. ("ABBV" or the "Company"), news articles about the Company, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND RELEVANT BACKGROUND

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined herein) who purchased, or otherwise transacted in ABBV securities

on May 30, 2018 (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. According to its public filings, ABBV is a global, research-based biopharmaceutical company. On or about April 26, 2018, ABBV announced that it would conduct a modified "Dutch auction" to repurchase up to $7.5 billion of the Company's common stock (the "Dutch Tender Offer").

3. In a Dutch auction, a company sets a range of prices at which it is willing to buy back a fixed dollar amount of stock from the company's stockholders, and the stockholders choose the price within the range they would like to sell at, if at all. The company then buys back shares at whatever price level allows it to expend the total, fixed-dollar amount of money that the company was willing to spend. Accordingly, if shareholders are only willing to tender their shares at the higher end of the range, the company will repurchase fewer shares, whereas if enough shareholders tender shares at the bottom of the range, the company will repurchase a greater number of shares.

4. ABBV announced that it would repurchase $7.5 billion of stock through the Dutch Tender Offer, making it one of the largest Dutch tender offers in history. The maximum number of shares that would be repurchased would be a function of the "Purchase Price." The Purchase Price is the lowest price at which ABBV could buy back an aggregate $7.5 billion worth of stock. All shareholders who tendered at or below the Purchase Price would receive the Purchase Price, subject to potential proration. With regard to the Dutch Tender Offer, ABBV set its tender range at $99-$114 per share (in $1.00 increments). For example, at $99, ABBV could buy back up to 75.8 million of the Company's shares (4.8% of shares outstanding). At $114, ABBV could buy back up to 65.8 million shares (4.1% of shares outstanding). There was no minimum tender condition.

5. Notably, the closing price for the Company's shares on April 25, 2018 (the pre-Dutch Tender Offer announcement price) was $91.87, so the range of Purchase Prices ran from an approximate 8% premium to a 24% premium to the Company's then unaffected share price (though ABBV closed at $96.55 the day prior to setting the range and launching the offer).

6. ABBV shareholders were also entitled to participate in the Dutch Tender Offer at whatever price it cleared, rather than picking a specific price at which to tender. That had the same effect as tendering at $99.

7. In addition, ABBV had the right to purchase up to an additional 2% of its shares outstanding (approximately 32 million shares) if more than $7.5 billion worth of shares were tendered at or below the Purchase Price.

8. The Dutch Tender Offer commenced on May 1, 2018, and expired at midnight at the end of the day on May 29, 2018.[1] Shareholders had between those periods to elect to tender their shares.

9. The Dutch Tender Offer was facilitated through Section 13(e)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), as an issuer tender offer subject to Rule 13e-4.

---

[1] According to Michael H. Friedman and Joshua Ashley Klayman of Pepper Hamilton LLP, tender offers that expire at the end of the day (11:59pm or, here, midnight), as opposed to 5:00pm, present "administrative burdens on management," including requiring the issuer's management "to scramble in the middle of the night" to determine the tender offer results to issue a press release with the opening of the market. Having willingly accepted this administrative burden, ABBV's senior management, including defendant William J. Chase ("Chase"), were or should have been intimately involved in calculating the results of the Dutch Tender Offer and drafting the press release after midnight on May 29. These responsibilities required heightened awareness by defendants Chase and ABBV, including double and triple checking with the Dutch Tender depositary, Computershare Trust Company, N.A. ("Computershare"), to verify that all validly tendered shares prior to midnight were counted. Having set a late hour for the conclusion of the Dutch Tender, defendants cannot complain that they needed to work after hours to check and recheck the relevant data. *See* "Are We There Yet? Issuer Debt Tender Offers and Offering Period Requirements," https://media2.mofo.com/documents/090600issuerdebttenderoffers.pdf [Emphasis added.]

Accordingly, the Dutch Tender Offer was covered by Section 14(e) of the Exchange Act and Regulation 14E. *See* www.sec.gov/rules/interp/34-43069.htm. Section 14(e) of the Exchange Act is the antifraud provision for all tender offers, including tender offers under Rule 13e-4. Section 14(e) prohibits fraudulent, deceptive, and manipulative acts in connection with a tender offer. The antifraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5 also apply to all tender offers. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.

10. The Class Period begins on Wednesday morning, May 30, 2018. At approximately 8:00am Eastern Standard Time, before the stock market opened for regular trading, through a SCHEDULE TO (Amendment No. 7) Tender Offer Statement Under Section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934 (the "Initial Tender Offer Statement"), ABBV announced preliminary results of the Dutch Tender Offer (through an attached press release). The Company stated that a total of 75.7 million shares were tendered at or below the purchase price of $105 per share. Thus, ABBV would acquire 71.4 million shares of ABBV stock at $105 per share, for an aggregate cost of $7.5 billion gross of fees and expenses, or approximately 4.5% of the Company's shares outstanding.

11. The market reacted positively to this news because it revealed that shareholders in ABBV were only willing to part with their shares at a substantial premium to the previous spot price. That, in turn, suggested that the Company's future prospects were brighter than previously thought. During the trading day of May 30, 2018, based on the representation that the Dutch Tender Offer Price was $105 per share, ABBV stock traded between $100.83 and $103.16, and closed at $103.01. That closing price represented over a 3.5% gain from the previous day's close of $99.47. Over 31 million ABBV shares were traded that day, representing over $3.1 billion in dollar volume. In dollar terms, this was the greatest volume traded in ABBV on a single day since 2014.

12. At approximately 4:46pm on May 30, 2018, after the market had closed for regular trading, ABBV issued a press release and filed a SCHEDULE TO (Amendment No. 8) Tender Offer Statement Under Section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934 (the "Corrected Tender Offer Statement") announcing "updated preliminary results" of the Dutch Tender Offer. The Corrected Tender Offer Statement materially changed the results of the Dutch Tender Offer announced earlier that day in the Initial Tender Offer Statement. According to ABBV, a total of 74.0 million shares of ABBV's common stock had been tendered and not properly withdrawn at or below the purchase price of **$103 per share,** including 52.9 million shares that were tendered by notice of guaranteed delivery. Thus, ABBV was now stating that it would acquire approximately 72.8 million shares of its common stock at a reduced price of **$103 per share**, or approximately 4.6% of the shares outstanding.

13. The change from $105 per share to $103 per share was material. Believing that investors would only part with their shares at $105 forecasted bright future prospects for the Company. Learning that shareholders would instead be sellers at $103, by comparison, dampened that optimistic market assessment. When the market found out that the Dutch Tender Offer was actually priced at $103 per share, the consequences were swift and brutal. During the next trading day, May 31, 2018, ABBV stock traded sharply downward between $98.50 and $101 per share. By the end of the trading day on May 31, 2018, it closed down almost 4% at $98.94. Almost 19 million ABBV shares were traded that day. Thus, purchasers of ABBV stock on May 30, 2018, who purchased at artificially inflated prices, collectively lost well over $100 million in under 24 hours as a result of the Company's corrective disclosure.

14. Despite the price in the Initial Tender Offer Statement being "preliminary" and "subject to change," it is quite *atypical to revise the tender clearing price in a Dutch tender offer*—

*especially of the magnitude experienced with the ABBV Dutch Tender Offer*. In an attempt to mollify furious ABBV investors who were deceived by the Initial Tender Offer Statement about the material discrepancy in the pricing, the Company stated in the Corrected Tender Offer Statement that "this update reflects additional shares that were validly tendered by notice of guaranteed delivery, *but that were erroneously omitted from the initial preliminary results provided to AbbVie by Computershare Trust Company*, *N.A.*, the depositary for the tender offer." According to a May 31, 2018 ABBV "media statement," this allegedly occurred due to a failure by Computershare to properly account for all validly tendered shares that had been received the prior evening (May 29) by electronic mail.[2] In other words, the Company's excuse is that it could not perform simple arithmetic and/or failed to check the work of its depositary before inducing investors to buy some $3 billion of the Company's stock. Because the Dutch Tender Offer expired on May 29, 2018 at midnight (as opposed to 5:00pm, as do some tender offers), defendant Chase and ABBV knew, or recklessly disregarded, that validly tendered shares could be received well after normal business hours. Thus, in verifying

---

[2] The pertinent text of the Media Statement is as follows:

> <u>AbbVie Statement on Preliminary Dutch Auction Tender Offer Results</u>
>
> AbbVie apologizes for any confusion regarding the recently published preliminary results of our Dutch Auction Tender Offer. On May 30, 2018, Computershare Trust Company, the depositary for the tender offer, provided inaccurate preliminary results regarding the number of validly tendered shares, which impacted the calculation of both the preliminary purchase price and proration factor for the tender offer. These results were disclosed in AbbVie's initial preliminary press release at 8am EST. After the press release was issued, Computershare notified AbbVie of this error. The error occurred due to a failure by Computershare to properly account for all validly tendered shares that had been received the prior evening by electronic mail. Upon receipt from Computershare of verified numbers, AbbVie immediately issued revised preliminary results in a subsequent press release on May 30, 2018 at 4:46pm EST.

Computershare's numbers, Defendants should have acted with heightened awareness, including double and triple checking Computershare's tabulations and calculations and ascertaining whether all validly tendered shares prior to the midnight deadline were accounted for, especially those that had allegedly "been received the prior evening by electronic mail."

15. For at least three additional reasons, Defendants' excuses ring hollow.

16. *First*, it is highly unlikely that ABBV discovered its substantial "error" after the close of trading on May 30, 2018 (*e.g.*, 4:01pm), with the press release that followed at 4:46pm. In fact, the May 31, 2018 media statement admits that Computershare "notified ABBV" about the failure to count millions of validly tendered shares after the Initial Tender Offer Statement was issued. It is exceedingly unlikely that Computershare made this notification after the market closed on May 30, 2018, as the depositary, during regular trading hours, would have surely seen the *millions* of validly tendered shares timely submitted by email (but omitted from the press release) *in the morning* on May 30, 2018. Inexplicably ABBV purportedly waited for "verified numbers" before issuing the Corrected Tender Offer Statement. Because of the failure to count millions of shares that had been validy tendered, ABBV knew that the results reported in the Initial Tender Offer Statement were materially false and misleading. Yet, notwithstanding tens of millions of ABBV shares that were changing hands, Defendants failed to halt the trading in ABBV stock and/or warn the market that the Initial Tender Offer Statement should no longer be relied upon. A company is duty bound to make corrective disclosures immediately upon learning of false or misleading information that it itself has put into the marketplace. Here, the most plausible inference is that ABBV learned of the error far earlier in the trading day, but chose to let the market close before revealing that it could not conduct a simple arithmetic calculation and/or failed to check the work of its depositary. The Company's

delay of the corrective disclosure until after trading closed caused tens of millions of shares to be traded and purchased at artificially inflated prices.

17. *Second*, as a recent case just held with respect to tender offers under 14(e) of the Exchange Act, negligence can suffice when stating such a claim (*Varjabedian v. Emulex*, 888 F.3d 339 (9th Cir. 2018)). Even if ABBV did not act with intent, it is beyond plausible that the Company's (i) failure to perform grammar-school arithmetic and/or check the work of its depositary, and (ii) decision to disclose this materially false calculation to the marketplace constitutes conduct that falls well below the reasonably-prudent-person standard of care.

18. *Third*, even if negligence is not the requisite mental state, there is a strong inference that Defendants acted recklessly. The Company surely knew that one of the largest tender offers in history was being closely watched by investors. It was nothing short of severe recklessness to announce results that, with no plausible excuse, simply failed to count *millions* of shares that were validly tendered prior to midnight at an amount well below the $105 price specified in the press release. Indeed, defendant Chase, who signed the Initial Tender Offer Statement, is ABBV's Chief Financial Officer. A grammar-school student could easily perform the mathematical calculations necessary to derive the Purchase Price. Other than reckless misconduct, there is no plausible explanation for how a Fortune 100's CFO failed to correctly tabulate the tendered shares (and/or properly ascertain whether all the validly tendered shares prior to midnight had been accounted for) and then publicly reported materially false, market-moving information to shareholders.

19. In addition, at all relevant times, Computershare was ABBV's agent and acted within the scope of its agency as the depositary for the Company in the Dutch Tender Offer. Computershare knew that its Dutch Tender Offer tabulations and analyses would be incorporated into the Company's press releases and filings, and would be relied upon by shareholders and influence the market. As

described herein, Computershare acted with reckless indifference by failing to check its work and/or incorporating all available data into its analyses that were sent to ABBV for publication. *See Tellabs v. Makor Issues & Rights, Ltd.*, 513 F.3d 702, 710 (7th Cir. 2008) (scienter may be imputed to the corporation based on intent and/or reckless disregard, even if that individual/entity is not a named defendant).

## JURISDICTION AND VENUE

20. The claims asserted herein arise under and pursuant to Sections 10(b), 14(e) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5, and 15 U.S.C. § 78n(e).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

22. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). ABBV is located in this District and its shares are traded in this District and many of the acts and practices complained of occurred in substantial part herein.

23. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

24. As reflected in the PSLRA certification previously filed with the Court on or about July 26, 2018 with its intial complaint, Lead Plaintiff purchased and transacted in ABBV securities on May 30, 2018 and was damaged thereby.

25. Defendant ABBV is a Delaware corporation maintaining its principal place of business at 1 North Waukegan Road, North Chicago, Illinois. 60064. ABBV shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ABBV."

26. Defendant Chase serves as the Executive Vice President and Chief Financial Officer of ABBV. Defendant Chase signed the materially false and misleading Initial Tender Offer Statement. On or about October 19, 2018, Defendant Chase announced his retirement from ABBV, effective mid-2019.

27. Non-party Computershare was the depositary for the Dutch Tender Offer. As such, Computershare was ABBV's agent in connection therewith. Among its duties and responsibilities as an agent for the issuer in connection with a tender offer, depositaries like Comptershare are typically authorized and directed to accept tenders of shares made pursuant to the terms and conditions of the tender offer. The depositary may rely on any certificate, instrument, opinion, representation, notice letter or other document delivered to it and believed by it to be genuine and to have been signed by the proper party or parties.

28. Furthermore, a depositary typically takes steps to establish and maintain an account at the book-entry transfer facility for book-entry transfers of shares, as set forth in the "letter of transmittal and the offer to purchase," and the depositary complies with the provisions of Rule 17Ad-14 under the Securities Exchange Act of 1934, as amended. This account is maintained until all shares tendered pursuant to the tender offer have been withdrawn, accepted for payment or returned.

29. Moreover, on a daily basis, or more frequently if requested by the issuer as to major tally figures, a depositary in a tender offer (such as Computershare) typically advises the issuer by telephone or in writing, based upon its preliminary review (and at all times subject to final

determination by the issuer): (a) the number of shares duly tendered on such day; (b) the number of shares duly tendered represented by certificates physically delivered to the depositary on such day; (c) the number of shares represented by "notices of guaranteed delivery" delivered to the depositary on such day; (d) the number of shares withdrawn on such day; (e) the number of shares about which the depositary has questions concerning the validity of the tender; and (f) the cumulative totals of shares in categories (a) through (e) above on such day. To advise the issuer of such information, a depositary necessarily needs to check the shares tendered each day (via electronic and/or any other means), including any shares tendered prior to the deadline.

30. The depositary also typically provides to the issuer: (a) a written report confirming the above information; (b) master lists of shares tendered for purchase, upon request; (c) such reasonable information, to the extent such information has been furnished to the depository, on the tendering shareholders, upon request; and (d) any information relating to the tendered shares, offer to purchase, letter of transmittal, agent's messages or notices of guaranteed delivery, as the issuer may request from time to time.

31. Shares received electronically by a depositary – including those delivered by "guaranteed delivery" – are readily available and easily accessible by depositaries through their mainframe and electronic mail systems. Additionally, an electronic guaranteed delivery of millions of shares would typically be sent to Computershare by The Depository Trust Company ("DTC") or by a broker. Depositaries such as Computershare are accustomed to receiving large numbers of tendered shares from the DTC and/or brokers, and customarily look-out for such tendered shares, even those received at the eleventh hour.

32. Finally, on the night (or evening) that a tender offer expires, a depositary keeps employees on hand in the office to (a) make sure that all validly tendered shares are accounted for

and their tabulations and calculations are correct, and (b) to interact with the issuer (or its agents) to make sure all relevant information is properly transmitted, to determine the tender offer results, and to ensure that all questions and inquiries about the tender tabulations and calculations are answered.

33. As shown above, the tender offer depositary process is interactive, involving the depositary and the issuer. Indeed, in connection with the Dutch Tender, ABBV committed that it would "announce the preliminary results of the Offer, including price and preliminary information about any expected proration, on the business day following the Expiration Date." Thus, defendants were under an obligation to ensure and verify that they obtained the correct information from Computershare (including the accurate number of validly tendered shares), to properly determine the tender results and issue a true and correct Initial Tender Offer Statement. That required an interactive process.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

34. The Class Period begins on Wednesday morning, May 30, 2018. At approximately 8:00am Eastern Standard Time, before the stock market opened for regular trading, ABBV filed the Initial Tender Offer Statement with the SEC. Defendant Chase signed the Initial Tender Offer Statement. That press release attached to the Initial Tender Offer Statement stated in relevant part:

> NORTH CHICAGO, Ill., May 30, 2018 /PRNewswire/ — AbbVie (NYSE: ABBV) today announced the preliminary results of its modified Dutch auction tender offer, which expired at 12:00 midnight, New York City time, at the end of May 29, 2018. Based on the preliminary count by Computershare Trust Company, N.A., the depositary for the tender offer, a total of 75,743,313 shares of AbbVie's common stock, $0.01 par value per share, were properly tendered and not properly withdrawn at or below the purchase price of $105 per share, including 49,129,844 shares that were tendered by notice of guaranteed delivery. AbbVie has been informed by the depositary that the preliminary proration factor for the tender offer is approximately

> 94.3 percent. In accordance with the terms and conditions of the tender offer, and based on the preliminary count by the depositary, AbbVie expects to acquire approximately 71.4 million shares of its common stock at a price of $105 per share, for an aggregate cost of approximately $7.5 billion, excluding fees and expenses relating to the tender offer. These shares represent approximately 4.5 percent of the shares outstanding. . . . .

35. The foregoing statements were materially false and misleading and/or omitted to state other facts necessary to make the statements made not misleading because, *inter alia*, it materially misrepresented the number of validly tendered shares, which impacted the calculation of both the purchase price and proration factor for the Dutch Tender Offer. Most importantly, based on this materially false information, the price to be paid in the Dutch Tender Offer was not $105 per ABBV common share, it was actually $103 per share. Based on this materially false statement, ABBV shares traded-up sharply on May 30, 2018, closing at $103.01 per share, on volume of over 30 million shares.

**THE TRUTH IS REVEALED**

36. After the close of trading on May 30, 2018, at approximately 4:46pm, the Company stunned investors by issuing the following press release (and also filing the Corrected Tender Offer Statement with the SEC). The corrected Tender Offer Statement was signed by defendant Chase. The press release stated in pertinent part:

> NORTH CHICAGO, Ill., May 30, 2018 /PRNewswire/ – AbbVie (NYSE: ABBV) today announced the preliminary results of its modified Dutch auction tender offer, which expired at 12:00 midnight, New York City time, at the end of May 29, 2018.This update replaces the preliminary results announced at 8:00 am, New York City time, on May 30, 2018. This update reflects additional shares that were validly tendered by notice of guaranteed delivery, but that were erroneously omitted from the initial preliminary results provided to AbbVie by Computershare Trust Company, N.A., the depositary for the tender offer. **Final results of the tender offer will be issued no later than June 4, 2018 following the expiration of the notice of guaranteed delivery period.** Based on the updated preliminary count by

> Computershare Trust Company, N.A., the depositary for the tender offer, a total of 74,033,457 shares of AbbVie's common stock, $0.01 par value per share, were properly tendered and not properly withdrawn at or below the purchase price of $103 per share, including 52,915,569 shares that were tendered by notice of guaranteed delivery. AbbVie has been informed by the depositary that the preliminary proration factor for the tender offer is approximately 98.4 percent. In accordance with the terms and conditions of the tender offer, and based on the preliminary count by the depositary, AbbVie expects to acquire approximately 72.8 million shares of its common stock at a price of $103 per share, for an aggregate cost of approximately $7.5 billion, excluding fees and expenses relating to the tender offer. These shares represent approximately 4.6 percent of the shares outstanding. . . . .

37. By comparing the two releases, it appears that ABBV utterly failed to account for *almost four million shares tendered by guaranteed delivery*. There is no plausible excuse for this oversight. The Company cannot and has never claimed that the shares were submitted late, irregularly, or in any other fashion that would allow a person exercising even a scintilla of prudence and basic oversight to overlook them.

38. Once the Company corrected its materially false initial statement, the price of ABBV shares declined precipitously. Lead Plaintiff realleges that ABBV did not discover its failure to account for millions of validly tendered shares at 4:46pm on May 30—45 minutes after the market closed. Indeed, ABBV admitted that Computershare notified the Company of the error after the Initial Tender Offer Statement was issued. Thus, the most plausible inference is that Computershare and ABBV knew or, if not for their severe recklessness, would have known far earlier in the trading day that they failed to perform simple addition. Waiting until after the close of trading to issue a corrective statement was unreasonable given the massive volume of activity in ABBV's stock during regular trading hours. Investors should not have been misled in the first place as a result of defendants' severe recklessness; they certainly had a right to learn the truth during regular market hours (by ABBV halting trading in the stock until it could issue a statement warning the market not

to rely on the materially false and misleading Initial Tender Offer Statement), not after ABBV allowed over $3 billion of inflated purchases in the open market.

39. On May 31, 2018, *Bloomberg* published an article entitled: *Traders Are Furious After Computer Botches Stock Sale*. While the Company had stated that the numbers were "preliminary" and "subject to change," a hedge fund manager quoted in the article stated that *"he has never seen a company change the pricing of a tender hours after releasing initial terms."* The article stated, in relevant part:

> Equity traders were fuming after AbbVie Inc., maker of the world's biggest-selling medicine, Humira, announced the wrong price in a Dutch auction tender for about $7.5 billion of its own stock.
> The North Chicago, Illinois-based pharmaceutical giant last night corrected the price it will pay for shares tendered in the buyback offer to $103 apiece, from $105 announced earlier in the day. AbbVie said some stock was "erroneously omitted from the initial preliminary results" in calculations by a third-party depositary. What's infuriating traders is that AbbVie rose the most in a month during Wednesday's session—before the mistake was announced . . . .
>
> Only a handful of Dutch auctions have ever exceeded AbbVie's. Amgen Inc.'s $10 billion offer in March was one. Home Depot Inc. did another for $10.5 billion in shares in 2007. *Michael Samuels, an event-driven portfolio manager for Broome Street Capital, said he has never seen a company change the pricing of a tender hours after releasing initial terms. Seven other U.S. traders who asked not to be named voiced similar dismay*. . . . A spokesperson for Computershare acknowledged the mistake and said the company apologized for the "one-off issue." Adelle Infante, a spokeswoman for AbbVie, pointed to Wednesday's press release in response to a request for comment. [Emphasis added].

## ADDITIONAL SCIENTER ALLEGATIONS

40. While Lead Plaintiff believes that negligence suffices for the 14(e) claim, for purposes of the 10(b) claim, defendants acted with the requisite scienter as well. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the

Company during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding ABBV and the results of the Dutch Tender Offer, were active and culpable participants in the fraud alleged herein.

41. Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of personnel at the highest levels of the Company, including defendant Chase, the Company's CFO. Notably, as described herein, because the Dutch Tender Offer expired on May 29, 2018 at midnight (as opposed to 5:00pm) Chase and ABBV knew, or recklessly disregarded, that validly tendered shares could be received up until midnight. Thus, they should have acted with a heightened awareness to double and triple check Computershare's tabulations and calculations and should have ascertained whether all validly tendered shares prior to the midnight deadline were accounted for, including those that had allegedly "been received the prior evening by electronic mail."

42. Defendant Chase, because of his position with ABBV, controlled the financial contents of the Company's public statements during the Class Period. Defendant Chase was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. No person—let alone the CFO of a massive public company—could review (and confirm the completeness of) the data and simply fail to count almost four million validly tendered shares. The only plausible explanations are that ABBV did not review the data at

all before making a material misrepresentation to the marketplace or that the Company's review was so irresponsibly cursory that the officer of the Company responsible for keeping its books failed to perform third-grade arithmetic. Either way, there is a strong inference that defendants engaged in such an extreme departure from the standard of care that their misconduct constituted actionable recklessness (especially given the midnight deadline of the Dutch Tender Offer, and the need to check for any shares validly tendered up until that time, so as to prepare a truthful press release and Initial Tender Offer Statement).

43. Defendants surely knew that the marketplace was following the Dutch tender process closely and that billions of dollars of Company shares would trade following the announcement of the tender clearing price. Armed with that knowledge, any reasonable CFO would check and recheck the data to assure accuracy. Failing to do so, or failing to perform basic addition, is not some minor deviation, but a meaningful departure from the standard of care.

44. Because of his position and access to material non-public information, defendant Chase knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, defendant Chase is responsible for the accuracy of ABBV's corporate statements (including the Initial Tender Offer Statement) and is therefore responsible and liable for the misrepresentations contained therein.

45. Furthermore, Defendants knew or were severely reckless in disregarding that the statements were materially false and misleading and/or omitted to state other facts necessary to make the statements made not misleading because: (1) Defendants rushed-out the Dutch Tender Offer results that were riddled with serious mistakes that had the ability to and did move the market without proper verification; and (2) given the timing of the corrective disclosure (*i.e.* almost

immediately after the close of the market) Defendants were aware there was a problem with the announced results of the Dutch Tender Offer earlier in the trading day but did not issue a timely corrective disclosure and/or halt the trading of the stock, allowing countless additional shares to be purchased by misled investors at inflated prices.

46. Finally, at all relevant times, Computershare acted within the scope of its agency as the depositary for the Company in the Dutch Tender Offer. Thus, Computershare's scienter should be imputed to ABBV. Computershare knew that its Dutch Tender Offer tabulations and analyses would be incorporated into the Company's press releases and filings, and would be relied upon by shareholders and influence the market. Computershare acted with reckless indifference by failing to check its work and/or incorporating all available data into its analyses that were sent to ABBV for publication.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

47. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased, or otherwise transacted in ABBV securities during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, or any entity in which Defendants have or had a controlling interest.

48. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ABBV shares were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified

from records maintained by ABBV or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented the results of the Dutch Tender Offer;
- whether Defendant Chase caused ABBV to issue false and misleading statements during the Class Period;
- whether defendants acted negligently, knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of ABBV securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

53. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

54. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 1288 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

55. In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud on the market doctrine for the following reasons set forth below.

56. The market for ABBV's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, the securities traded at artificially inflated prices during the Class Period, Lead Plaintiff and other members of the Class purchased or otherwise transacted in ABBV securities relying upon the integrity of the market price of the securities and market information relating to the Dutch Tender Offer and have been damaged hereby.

57. During the Class Period, the artificial inflation of the securities was caused by the material misrepresentations and omissions particularized in this Complaint and caused the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Dutch Tender Offer. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects,

thus causing the price of the securities to be artificially inflated at all relevant times, and when disclosed negatively affected their value. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the securities at such artificially inflated prices, and each of them has been damaged as a result.

58. At all relevant times, the market for ABBV's common stock (and other securities) was an efficient market for the following reasons, among others:

(a) The Company's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, ABBV filed periodic public reports with the SEC and/or the NYSE;

(c) Defendants regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

(d) ABBV was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59. As a result of the foregoing, the market for the securities promptly digested current information regarding ABBV from all publicly available sources and reflected such information in the price of the securities. Under these circumstances, all purchasers of ABBV securities during

the Class Period suffered similar injury through their purchase thereof at artificially inflated prices and are entitled to a presumption of reliance.

## LOSS CAUSATION

60. Defendants' wrongful conduct as alleged herein directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. During the Class Period, Lead Plaintiff and the Class purchased, or otherwise transacted in ABBV securities at artificially inflated prices and were damaged thereby. The price of ABBV securities significantly declined when the true information was revealed, causing investors' losses. Following disclosure that the Dutch Tender Offer price was only $103 per share, the price of ABBV's common stock (as well as its other securities) declined sharply on heavy trading volume of almost 19 million shares.

## NO SAFE HARBOR

61. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the

forward-looking statement was authorized or approved by an executive officer of ABBV who knew that the statement was false when made.

**COUNT I**
**(Against All Defendants For Violations of Section 14(e) of the Exchange Act)**

62. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of material fact or omit to state any material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading . . ." 15 U.S.C. § 78n(e).

64. As discussed above, defendants filed and delivered the false and misleading Initial Tender Offer Statement. Defendants knew or recklessly disregarded and/or were negligent in that the Initial Tender Offer Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65. Additionally, defendants failed to timely correct the Initial Tender Offer Statement filing.

66. The Initial Tender Offer Statement was prepared, reviewed and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the results of the Dutch Tender Offer and the consideration to be paid to stockholders via the Dutch Tender Offer.

67. In so doing, Defendants made untrue statements of material facts and omitted facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in

the preparation of the Initial Tender Offer Statement, defendants were aware of this information and their obligation to disclose this information in the Initial Tender Offer Statement.

68. The omissions and incomplete and misleading statements are material. A reasonable investor would view the information identified above as altering the total mix of information available to stockholders.

69. Defendants knowingly, or with deliberate recklessness and/or negligently, misrepresented the material information identified above from the Dutch Tender Offer and the Initial Tender Offer Statement, causing certain statements therein to be materially incorrect and/or incomplete and therefore misleading. As a senior officer of ABBV, Defendant Chase had knowledge of the details of the Dutch Tender Offer.

70. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**(Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

71. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73. During the Class Period, Defendants: (1) engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; (2) made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (3) employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ABBV's securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase ABBV securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

74. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases and other statements and documents described above. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the ABBV Dutch Tender Offer.

75. By virtue of his position at ABBV, Defendant Chase had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants (including checking the work of the depositary). Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

76. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the Chief Financial Officer

of ABBV, Defendant Chase had knowledge of the details of ABBV's internal financial affairs and the results of the Dutch Tender Offer.

77. Defendant Chase is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, Defendant Chase was able to and did, directly or indirectly, control the content of the statements of ABBV (including the Initial Tender Offer Statement). As an officer of a publicly-held company, Defendant Chase had a duty to disseminate timely, accurate, and truthful information with respect to ABBV's businesses, operations, future financial condition, future prospects and the Dutch Tender Offer results. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ABBV securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Dutch Tender Offer result, Lead Plaintiff and the other members of the Class purchased, or otherwise transacted in ABBV securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

78. During the Class Period, ABBV common stock (and other securities) was traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased, or otherwise transacted in ABBV securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Lead Plaintiff and the Class, the true value of ABBV securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price

of ABBV securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

79. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false financial statements to the investing public related to the Dutch Tender Offer.

**COUNT III**
**(Violations of Section 20(a) of the Exchange Act Against Defendant Chase)**

81. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82. During the Class Period, Defendant Chase participated in the operation and management of ABBV, and conducted and participated, directly and indirectly, in the conduct of ABBV's business affairs, including the Dutch Tender Offer. Because of his senior position, defendant Chase knew the adverse non-public information regarding ABBV and the results of the Dutch Tender Offer.

83. As an officer of a publicly owned company, Defendant Chase had a duty to disseminate accurate and truthful information with respect to ABBV's financial condition and results of the Dutch Tender Offer, and to correct promptly any public statements issued by ABBV which had become materially false or misleading.

84. Because of his position of control and authority as a senior officer, Defendant Chase was able to, and did, control the contents of the various reports, press releases and public filings which ABBV disseminated in the marketplace during the Class Period concerning ABBV's financial prospects (including the Initial Tender Offer Statement). Throughout the Class Period, Defendant Chase exercised his power and authority to cause ABBV to engage in the wrongful acts complained of herein. Defendant Chase therefore, was a "controlling person" of ABBV within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of ABBV securities.

85. Defendant Chase, therefore, acted as a controlling person of ABBV. By reason of his senior management position at ABBV, Defendant Chase had the power to direct the actions of, and exercised the same to cause, ABBV to engage in the unlawful acts and conduct complained of herein. Defendant Chase exercised control over the financial operations of ABBV and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

86. By reason of the above conduct, Defendant Chase is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ABBV.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury.

Dated: November 1, 2018

**KELLER LENKNER LLC**

By: /s/ Tom Kayes
Ashley C. Keller
Seth A. Meyer
Tom Kayes
150 N. Riverside Plaza, Suite 2570
Chicago, IL 60606
Telephone: (312) 741-5222

U. Seth Ottensoser
1330 Avenue of the Americas
New York, NY 10019
Telephone: (212) 653-9715

*Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that I caused the foregoing document to be served on all ECF-registered counsel of record in this case on November 1, 2018, by way of the Court's CM/ECF system.

/s/ Tom Kayes